## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Neil M.,

                                 Case No. 19-CV-02434 (ECW)

       Plaintiff,

     v.                                    **ORDER**

Andrew Saul, Commissioner of Social
Security

       Defendant.

This matter is before the Court on Plaintiff Neil M.'s ("Plaintiff") Motion for Summary Judgment (Dkt. 17) ("Motion") and Defendant Commissioner of Social Security Andrew Saul's ("Defendant") Cross-Motion for Summary Judgment (Dkt. 21) ("Cross-Motion"). Plaintiff, proceeding pro se, filed this case seeking judicial review of a final decision by Defendant denying his application for disability insurance benefits. For the reasons stated below, Plaintiff's Motion is denied, and Defendant's Cross-Motion is granted.

## I.      <u>BACKGROUND</u>

Plaintiff protectively filed an application for benefits under Title II of the Social Security Act (42 U.S.C. §§ 416(i) & 423) on January 14, 2016, alleging disability since October 3, 2011, due to cervical spine, lumbar spine, thoracic spine, left knee injury, right

shoulder injury, persistent headaches, numbness in arms and legs, anxiety, and fatigue. (R. 344-350, 388).[1]  Plaintiff's application was denied initially and on reconsideration.

Plaintiff requested a hearing before an administrative law judge, which was held on May 21, 2018 before Administrative Law Judge David B. Washington ("ALJ").  (R. 25.)  Plaintiff was represented by legal counsel at the hearing before the ALJ.  (R. 14.) The ALJ issued an unfavorable decision on August 6, 2018.  (R. 14-28.)

Following the five-step sequential evaluation process under 20 C.F.R. § 404.1520(a), the ALJ determined that Plaintiff last met the insured status requirements for the Social Security Act on December 31, 2016.[2]  (R. 16.)  The ALJ went on to determine that Plaintiff had not engaged in substantial gainful activity since October 3, 2011, the alleged onset date, through the last date of insured of December 31, 2016.  (*Id*.)

At step two, the ALJ determined that Plaintiff had the following severe impairments at the date last insured: degenerative disc disease; headaches; and degenerative joint disease.  (*Id*.)  The ALJ determined that Plaintiff's other physical impairments were not severe during the period Plaintiff was insured.  (R. 16-17.)

At the third step, the ALJ determined that through the date of last insured, Plaintiff did not have an impairment that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 17.)

---

[1]     The Administrative Record can be found at Docket No. 12.

[2]     Plaintiff does not dispute his date last insured.

At step four, after reviewing the entire record, the ALJ concluded that Plaintiff had the following residual functional capacity ("RFC"):

> [S]edentary work as defined in 20 CFR 404.1567(a) except occasional use of ramps and stairs, no work involving the use of ladders, ropes or scaffolds, occasional stooping, kneeling and crouching, no crawling, no work at unprotected heights or near dangerous, exposed, moving machinery, and occasional reaching above the shoulders, pushing and pulling.

(R. 18.)  Based on this RFC, the ALJ determined that Plaintiff was unable to perform past relevant work as truck driver.  (R. 27.)

At the fifth step, the ALJ elicited the testimony of a vocational expert ("VE") and determined that based on an individual with the Plaintiff's age, education, work experience, and residual functional capacity, Plaintiff could perform other work existing in significant numbers in the national economy including as an information clerk (DOT 237.367-022), bonder (DOT 726.685-066), and optical assembler (DOT 713.687-018). (R. 27-28.)

Accordingly, the ALJ found Plaintiff not disabled.  (R. 28.)

Plaintiff's attorney withdrew his representation on October 3, 2018.  (R. 10.) Plaintiff requested review of the ALJ's decision.  (R. 1.)  The Appeals Council denied Plaintiff's request for review on July 1, 2019, which made the ALJ's decision the final decision of the Commissioner.  (R. 1-5.)  Plaintiff then commenced this action for judicial review.  The Court has reviewed the entire administrative record, giving particular attention to the facts and records cited by the parties.  The Court will recount the facts of record only to the extent they are helpful for context or necessary for resolution of the specific issues presented in the parties' motions.

## II.   RECORD

Plaintiff suffered a work injury while employed as a truck driver in December 2010, which he first reported in April 2011.  (R. 369-370, 1614.)  In March 2011, Bryan Lynn, M.D., found full cervical range of motion and strength and sensation in the upper and lower extremities, and released Plaintiff back to work without restrictions.  (R. 859, 1164.)

On September 27, 2011, Plaintiff underwent a neurological consultation with Jawad Bajwa, M.D., regarding neck and back pain as a result of the December 2010 accident.  (R. 492.)  Dr. Bajwa noted that the examination was unremarkable other than Plaintiff's subjective complaints, and while he thought Plaintiff might need to modify his work type, he did not think Plaintiff was "truly completely disabled."  (R. 492-494.)  The MRI of the lumbar spine showed only moderate disk degeneration without stenosis or neural compression, while the MRI of the cervical spine showed a small AP central canal, pseudo spondylosis, and C7 nerve root impingement with cord compression.  (R. 492-93, 536, 538.)  Plaintiff showed no extremity weakness and had a normal gait.  (R. 492-93.)

Plaintiff stopped working on October 3, 2011.  (R. 389.)

Plaintiff had a surgical consultation with Stefano Sinicropi, M.D., in October 2011, at which time Dr. Sinicropi recommended cervical fusion, followed by 4-12 weeks off work, depending on his job.  (R. 758-762).  He also limited Plaintiff to lifting, carrying, pushing, and pulling no more than 20 pounds, and advised against driving.  (R. 1108.)

October 31, 2011, Mark Larkins, M.D., completed an independent medical evaluation of Plaintiff.  (R. 506.)  Upon examination, Plaintiff showed normal extremity reflexes and strength, and he was able to walk and squat.  (R. 509.)  Plaintiff also showed a full range of motion of his cervical spine.  (R. 510.)  Dr. Larkins opined that Plaintiff was capable of working and performing short hauls without lifting or bending, but was incapable of long-distance multi-state trucking hauls.  (R. 510).

On December 1, 2011, Dr. Larkins offered a clarification of his previous report in which he noted a slight restriction in the lumber motion that was not significant and opined that Plaintiff did not show the proper indications to proceed with cervical surgery, and instead suggested more conservative measures such as steroid injections and physical therapy.  (R. 504.)

On December 12, 2011, Dr. Sinicropi noted that he expected Plaintiff to be off work for 4-12 weeks depending on the type of job.  (R. 762.)

During a pre-operation assessment of Plaintiff, it was noted that his lower extremities were unremarkable, that Plaintiff was not in acute distress, and his coordination was normal.  (R. 1347-48.)

Dr. Sinicropi performed a cervical fusion on January 9, 2012.  (R. 602-04.)  The only discharge limitation was "not to do any heavy bending or lifting."  (R. 595.)  On January 25, 2012, it was reported that Plaintiff's neck pain was slightly better, but that he continued to have cervical pain with intermittent headaches.  (R. 917.)  Plaintiff's examination showed that he was neurologically intact with normal upper extremity motor function.  (R. 917.)  It was noted that his cervical spine should improve with time.  (R.

5

917.)  Dr. Sinicropi refilled Plaintiff's oxycodone, morphine, Valium, and Vistaril, but discussed a taper down with Plaintiff.  (R. 917.)

A follow-up radiology report found that Plaintiff's cervical alignment appeared grossly normal.  (R. 601, 794.)

A February 28, 2012, a workability form from Dr. Sinicropi provided that Plaintiff was to be off work from February 28, 2012 through March 28, 2012.  (R. 918.)  On the same date, Dr. Sinicropi opined that while Plaintiff complained of continuing symptoms, his symptoms had improved and that his "[r]ange of motion is approximately 75% in all directions.  Neurologically, he is intact.  No other findings."  (R. 920.)  Dr. Sinicropi noted he wanted Plaintiff to participate in conservative treatment, such physical therapy. and to continue his medication management.  (R. 920.)

In March 2012, Plaintiff reported stiffness and soreness in his neck with decreased headaches and it was noted that he was not in any apparent distress.  (R. 921.)  Plaintiff asserted that his symptoms were worse with sitting, walking, standing, and that he was unable to do any of these for more than ten minutes.  (R. 921.)  His symptoms were better with a changing of positions.  (R. 921.)

On March 27, 2012, Dr. Sinicropi provided that Plaintiff could not work from March 27, 2012 through April 24, 2012.  (R. 925.)  On the same date, it was noted that Plaintiff was still experiencing unrelenting back pain despite narcotic medications and was going to undergo medial branch blocks to see if he was a candidate for radiofrequency neurolysis.  (R. 1078.)  If this was unhelpful, then a total lumbar

replacement would be considered.  (R. 1078.)  Plaintiff underwent a medial branch block on April 10, 2012.  (R. 1223.)

On April 24, 2012, Dr. Sinicropi provided that Plaintiff could not work from April 24, 2012 through May 22, 2012.  (R. 935.)  Dr. Sinicropi also noted that the medial branch blocks did not alleviate pain and suggested a lumbar discography to determine if he was a candidate for a total disc replacement and L5-S1 segment.  (R. 1316.)

A June 21, 2012 lumbar discogram was normal other than an abnormality of the disc at L5-Sl. (R. 721-22, 764.)  It was noted that Plaintiff was taking both morphine and oxycodone for pain.  (R. 1217.)

On June 26, 2012, Dr. Sinicropi provided that Plaintiff could not work from June 26, 2012 through September 20, 2012.  (R. 949.)  On the same date, Dr. Sinicropi noted that as far as Plaintiff's cervical spine was concerned, he had undergone an uncomplicated fusion and was doing "significantly better."  (R. 950.)  However, based on the lumbar discography, the "L5-S I segment appears to be the primary and sole pain generator associated with his current disability and condition."  (R. 950.)  Dr. Sinicropi recommended a total lumbar disc replacement.  (R. 950.)  Dr. Sinicropi noted that this procedure involved a rapid recovery period.  (R. 950.)

On November 12, 2012, orthopedic specialist Paul Wicklund, M.D., conducted an independent medical examination of Plaintiff.  (R. 1450.)  Plaintiff reported that his surgical procedure helped his neck complaints and headaches and that his left arm also felt better.  (R. 1453.)  It was noted that the last time he saw Dr. Sinicropi he was complaining of headaches and numbness in his right arm.  (R. 1453.)  Plaintiff

complained that his lower back pain was getting worse.  (R. 1453.)  The examination

showed pain in the lower back on palpitation and a limited motion, but negative sign on

straight leg raising.  (R. 1453.)  His neck showed no tenderness or spasm, neurologically

his upper extremities were at normal strength with slight loss of feeling on the tip of his

right thumb.  (R. 1453.)  He was also positive for right shoulder impingement.  (R. 1453.)

The examination of his knee was normal.  (R. 1454.)  Dr. Wicklund believed that

Plaintiff had a good prognosis.  (R. 1454.)  Dr. Wicklund noted that Plaintiff sustained a

permanent aggravation to his cervical spine, but opined that "[a]s a result off his anterior

cervical fusion, [Plaintiff] has improved and in my opinion can do light duty work full-

time as long as he does no repetitive extension of his neck."  (R. 1454.)

On January 22, 2013, Dr. Sinicropi provided a workability form that the Plaintiff

was to be off work from January 1, 2013 until after his back surgery.  (R. 953.)  On the

same date, Dr. Sinicropi saw Plaintiff for a cervical spine follow-up.  (R. 954.)  Dr.

Sinicropi opined that Plaintiff has "really done well" after his cervical surgery with

significant decrease in his headaches, but that over the past six months he had noticed an

increase in neck pain, difficulty with his range of motion, with no radiculopathy.  (R.

954.)  Plaintiff's physical examination demonstrated that Plaintiff was neurologically

intact with no other significant findings.  (R. 953.)

On February 7, 2013, Dr. Wicklund opined that before Plaintiff underwent any

surgical intervention at the L5-S1 level, he was to participate in a supervised

strengthening and flexibility program for his lumbar spine.  (R. 1449.)  He saw no

indication that a disc replacement in a 39-year-old would be the first recommendation

made and noted that when Plaintiff was examined by a neurosurgeon on February 1, 2011, he had a completely normal neurological examination of his lower extremities and lumbar spine.  (R. 1449.)  Dr. Wicklund also noted that the MRI did not support the procedure and that the symptoms were all subjective.  (R. 1449.)

A February 18, 2013 CT of Plaintiff's cervical spine showed mild degenerative disk space narrowing at C3-4 and C4-5.  (R. 814).  A bony irregularity and slight lucency at the C6-C7 disk level with a fixation plate with good alignment was also noted.  (R. 814.)

On February 26, 2013, Dr. Sinicropi provided a workability form providing that Plaintiff was to be off work from February 26, 2013 through April 9, 2013.  (R. 955.)  On the same date, Dr. Sinicropi concluded that the fusion previously performed needed to be revised from a posterior approach.  (R. 958.)  Plaintiff's time off was extended to July 26, 2013, so that Plaintiff could remain off work pending surgery and recovery.  (R. 960.)

On March 26, 2013, Dr. Sinicropi found that Plaintiff had initially done well with his cervical fusion, but developed pseudoarthritis requiring a posterior decompression and fusion at the C6-C7 level.  (R. 1540.)

On April 1, 2013, Plaintiff underwent uncomplicated posterior cervical fusion and decompression at the hands of Dr. Sinicropi due to ongoing neck pain.  (R. 621, 629-30, 731-32.)  It was noted that after his surgery he was "up and around" and moving on his own power.  (R. 621.)  Again, the only limitation upon discharge was "not to do any heavy bending or lifting."  (R. 621.)

On April 17, 2013, Plaintiff complained of lower back pain and right lower extremity numbness. (R. 963.) No neurological changes were noted. (R. 963.) Plaintiff claimed that Dr. Sinicropi required him to be on eight Oxycodone a day and some MS Contin because he had "some" lower back complaints. (R. 963.) The importance of tapering down his narcotics use was discussed and it was recommended that he continue to avoid heavy frequent lifting, bending, or twisting. (R. 963.)

On May 14, 2013, Dr. Sinicropi extended Plaintiff's off worktime from May 14, 2013 through September 30, 2013. (R. 966.) On the same date, Dr. Sinicropi found that Plaintiff was doing "significantly better" with less frequent headaches. (R. 967.) His physical examination showed that he was neurologically intact with no other findings. (R. 967.)

On June 25, 2013, Plaintiff reported significant discomfort in his lower back and that his neck was slightly improved. (R. 968.) Plaintiff's physical examination remained unchanged and imaging showed a good fusion. (R. 968.) Plaintiff's medications were refilled and he was to continue with massage therapy. (R. 968.) Radiology showed a fusion at C6-C7 and the reminder of the cervical spine as stable. (R. 1570.)

On August 6, 2013, Plaintiff was seen by Nancy K. Thorvilson, M.D., related to his lower back pain and with respect to secondary concerns involving neck pain, headaches, other back pain, arm pain and tingling, as well as leg pain and tingling. (R. 658.) Plaintiff rated his pain a 7 out of 10. (R. 660.) Plaintiff noted that he was not looking for work, was seeking disability benefits, and took daily one-half mile walks. (R. 659-60.) Dr. Thorvilson noted during Plaintiff's examination that he moved fairly easily

10

about the room, had normal upright posture, normal lumbar lordosis and thoracic kyphosis, a normal gait pattern, and the ability to walk on his heels and toes. (R. 660-662.) Neurological examination was also normal. (R. 662.) Plaintiff showed normal strength in his upper extremities and showed normal flexion and extension in the lower extremities. (R. 661-62.) He only lacked 7 cm of being able to flex the chin to the chest and was able to normally move his neck to the left and right, while the range of motion test caused no radicular symptoms in his arms. (R. 661-62.) The range of motion of his back was limited by pain and while movement of the hips was normal, there was associated pain. (R. 661.) The prognosis for Plaintiff was extremely guarded and it was recommended that he enroll in an active rehabilitation program. (R. 663-664.) Plaintiff was encouraged to continue walking as an aerobic exercise. (R. 664.) Plaintiff did not complete the program, and only attended three sessions, citing insurance issues as the reason for his noncompletion. (R. 672.)

On September 20, 2013, Plaintiff saw Dr. Sinicropi for a follow-up, during which time he reported severe low back pain radiating into the thoracic region, even with minimal activity, and was awaiting a total lumbar replacement at the L5-S1 segment. (R. 980.) Dr. Sinicropi wanted Plaintiff to engage in high resistance training for his neck and lower resistance exercises for his lumbar region. (R. 980.)

On October 21, 2013, Dr. Wicklund performed an independent medical examination of Plaintiff. Plaintiff represented to Dr. Wicklund that despite his two cervical fusions, his headaches and the pain across his shoulders had returned, and he experienced intermittent shooting pain in both arms. (R. 1444.) Plaintiff also

complained that he still had pain in his right shoulder and occasional pain in his left knee. (R. 1444.)  The physical examination of Plaintiff by Dr. Wicklund showed positive impingement of the right shoulder with a normal examination of the left shoulder.  (R. 1455.)  He showed limited motion of his cervical spine.  (R. 1455.)  The examination of the lumbar spine also showed limited motion.  (R. 1445.)  He had no weakness when he stood on his heels and toes.  (R. 1445.)  The left knee showed no effusion and his patella tracked normally.  (R. 1445.)  The diagnosis for Plaintiff was degenerative disk disease at the lumbar spine, L5-S1, a post cervical fusion, impingement of the right shoulder and a normal left knee.  (R. 1445.)  Dr. Wicklund also opined as follows:

> It is my opinion that [Plaintiff] would have been disabled from work following his cervical disk surgery for a period of three months.  This would be true on both occasions, both after his anterior cervical fusion and after his posterior cervical fusion.  I see no indication he would have been disabled from work because of any complaints of right shoulder pain, thoracic back pain, left knee pain or low back pain since October 4, 2011.  His disability from work after the cervical spine surgery would have been total for three months and then he would have been partially disabled for another six weeks with restrictions.  There would have been no period of total or partial disability because of any other body part.  It is my opinion that the December 3, 2010 injury is the substantial contributing factor to his total and partial disability with reference to his cervical spine.  Currently, [Plaintiff] needs restrictions with regard to his cervical spine.  He should not do repetitive flexion and extension or rotation of his cervical spine while he works.  He can rotate within the normal range of motion noted on my examination.

(R. 1447.)  Dr. Wicklund also found that Plaintiff had reached a maximum medical improvement with regard to his neck months after his last cervical fusion and reached maximum medical improvement with regard to any right shoulder complaints, thoracic spine complaints, left knee complaints, and low back complaints within four months of the date of his December 2010 injury.  (R. 1447.)

12

On November 26, 2013, Dr. Sinicropi noted that Plaintiff had solid fusion at C6-C7, with slight improvement in neck pain but persistent headaches, for which he prescribed trigger point injections to decrease pain.  (R. 780, 981, 999.)  He also noted that Plaintiff had lower back pain with pain radiating into the thoracic spine for which he was waiting on CT images.  (R. 780, 981.)  Plaintiff's off work time was extended through April 1, 2014 by Dr. Sinicropi.  (R. 983.)

On February 24, 2014, Dr. Wicklund provided a supplemental opinion based on additional medical records he received.  (R. 1472.)  According to Dr. Wicklund, no further treatment of the cervical spine was necessary given the solid fusion based on the x-rays, and he did not believe that the trigger point injections would help with pain related to soft tissues and scar tissue.  (R. 1473.)

On March 7, 2014, Dr. Wicklund noted that Plaintiff was taking the following prescriptions:  Valium for anxiety; Oxycodone for pain; Morphine for pain; Butalbital, a barbiturate; Hydroxyz Pam, an antianxiety medication; and Pantoprazole for ulcers.  (R. 1474-75.)  Dr. Wicklund opined that he saw no causal connection between these medications and his cervical spine condition.  (R. 1475.)  According to Dr. Wicklund, there was no need for these medications and that Plaintiff's pain could be managed with non-narcotic medications.  (R. 1475.)

Plaintiff's time off was extended from April 1, 2014 through July 1, 2014.  (R. 1557.)

On April 25, 2014, Dr. Sinicropi issued a medical statement questionnaire regarding Plaintiff.  Dr. Sinicropi opined that Plaintiff was disabled at least until July 1,

2014.  (R. 1292.)  He also opined that Plaintiff could walk or stand a total of two hours

out of an eight-hour workday with a change of position.  (R. 1293.)  It was noted that

Plaintiff could stand 30 minutes, walk 15 minutes, and then change position to relieve

pain.  (R. 1293.)  Dr. Sinicropi believed that Plaintiff would need to be allowed to lie

down as needed to relieve pain.  (R. 1294.)  Dr. Sinicropi went on to opine that Plaintiff

could only occasionally lift 1-5 pounds with no heavier weights allowed; could never

balance, flex his neck, rotate his neck, reach with his hands; and rarely could handle or

use fingering using his hands.  (R. 1295.)  Plaintiff did not need any assistive device to

walk or stand.  (R. 1296.)  According to Dr. Sinicropi, Plaintiff was likely to be absent

from work more than three days per month.  (R. 1296.)

On June 2, 2014, Plaintiff underwent a CT scan for the cervical region related to

his pain.  (R. 987.)  There was some suspicion of early screw loosening with no hardware

movement.  (R. 987.)  Otherwise the CT scan showed mild degenerative changes with no

evidence of significant spinal canal or neural foraminal stenosis.  (R. 987-88.)  Dr.

Sinicropi noted that screw loosening was expected.  (R. 989.)

On June 10, 2014, Plaintiff saw Dr. Sinicropi regarding his back pain.  (R. 991.)

Dr. Sinicropi noted the loosening screws as part of his cervical fusion and that he needed

to be careful with bending, twisting, and lifting.  (R. 991.)  His physical examination

showed no new findings.  (R. 991.)  Dr. Sinicropi noted that medication management was

needed with respect to his cervical and lumbar issues.  (R. 991.)

On December 19, 2014, Dr. Sinicropi opined that foraminal stenosis was

significantly improved on the updated CT scan.  (R. 1531.)  Plaintiff asserted that he was still symptomatic, but that his medications helped.  (R. 1531.)  Plaintiff was to continue with his medication management and report back in three months for dosing instructions and to have him undergo an updated CT scan.  (R. 1531.)  Plaintiff's off work time was also extended from December 19, 2014 through March 6, 2015.  (R. 1554.)

On March 10, 2015, Dr. Sinicropi found that an updated CT scan of the cervical region showed "significant evidence of progressive healing" with some area of solid fusion in a narrow area.  (R. 1254, 1564.)  Dr. Sinicropi did not believe that Plaintiff needed revision surgery for his cervical spine.  (R. 1254.)  The plan was a medication weaning protocol and trigger point injections.  (R. 1254.)  Work restrictions were continued.  (R. 1254.)

On May 8, 2015, Plaintiff underwent needle point injections of steroids into painful postoperative regions, scar tissue, and myofascial trigger points.  (R. 1246.)  Partial relief was provided, but it was not complete.  (R. 1246.)  He also had some generalized "tightness through both sides in the trapezius and he tends to get a pulling sensation that can produce some bilateral arm discomfort and what that may be doing is elevating the first rib so that there is some pressure against the brachial plexus within the thoracic outlet."  (R. 1247.)  Pending a recheck, it was recommended that he engage in massage and to alternate between ice and heat.  (R. 1247.)  Plaintiff's medications during this period included, but were not limited to, morphine and oxycodone.  (R. 1261.)

On June 19, 2015, Plaintiff underwent trigger point injections to deal with his continued neck pain. (R. 1270.) Muscle tension had been relieved, but subjectively Plaintiff provided that the pain was not different. (R. 1270.)

On May 26, 2015, Plaintiff reported that despite the medication taper, his pain was staying about the same or "creeping" back up slightly. (R. 1528.) Plaintiff had full range of motion of his neck, which was supple. (R. 1528.) Lyrica medication was added for neuropathic pain and his medication taper was otherwise to continue. (R. 1529.) On the same date, it was noted that Plaintiff was to be off work until August 26, 2015, which was extended from his time off from March 10 through June 10, 2015. (R. 1552-53.)

On July 6, 2015, Plaintiff was seen for a follow-up for his trigger point injections. (R. 1526.) Plaintiff claimed some numbness from the injections, but no lasting relief. (R. 1526.) It had been noted that he was weaning off oxycodone, but that his symptoms were starting to rise a little bit even with the use of Lyrica. (R. 1526.) Plaintiff's Lyrica dosage was increased. (R. 1527.) Plaintiff was in a mild amount of discomfort, but showed a normal neurological examination, except for a little thumb numbness, and normal upper extremity motors. (R. 1526.)

On August 3, 2015, Plaintiff sought the possibility of using spinal cord stimulator technology for peripheral nerve damage to treat his arm pain and headaches. (R. 1298.) Plaintiff claimed that the trigger point injections had only provided marginal long-term benefit. (R. 1298.) Dr. Wicklund did not believe that the stimulator would help with Plaintiff's complaints of pain, given his medications, and on the basis that his cervical fusion appeared solid. (R. 1477.)

On February 19, 2016, Plaintiff was seen for pain primarily centered around his neck with radiation into the arm and headaches. (R. 1649.) Plaintiff was taking several medications, including morphine and oxycodone. (R. 1650.) Plaintiff asserted that butalbital and caffeine combination has helped with the frequency and intensity of his headaches. (R. 1649-50.) The examination of Plaintiff showed that he had no active arthritis, no gross motor weakness, and a normal gait. (R. 1652.) The motor examination for the upper and lower extremities was normal. (R. 1652.) With respect to range of motion, his cervical range was reduced by about 40-50% in all directions with probably over 60% reduction in range of motion in neck extension. (R. 1652.) Lumbar range of motion was reduced by approximately 25% in forward flexion and by about 40% to back extension and side bending. (R. 1652.) The assessment was a failed back surgery with ongoing neck pain with an adequate fusion at C6-7, a need for ongoing medical management of pain, low back pain of unclear etiology, and a sleep disturbance secondary to chronic pain. (R. 1652-53.) Discussion of using opioids to control pain was discussed and an opioid trial was initiated. (R. 1653.) Plaintiff was characterized a low risk for opioid abuse. (R. 1653.)

On March 1, 2016, Plaintiff filled out a daily activities questionnaire. (R. 444-51.) Plaintiff represented that his typical daily activities on good days involved taking short trips and doing some minor housework. (R. 445.) He was able to walk half a mile before needing to stop and rest. (R. 449.) On bad days he just sat, stood, and walked around for short periods. (R. 445.) Plaintiff claimed he only slept for one to two hours a night because of his pain. (R. 445). He also claimed that sometimes he needed help with

dressing, bathing, and using the toilet.  (R. 445.)  He was able to prepare meals.  (R. 446.)

He represented that he was able to mow his lawn but needed to take several small breaks.

(R. 446.)  He was also able to use the snowblower for snow removal.  (R. 446.)  Plaintiff

noted that he could walk, drive, and ride in a car to get around, and represented that he

tried to get out daily.  (R. 447.)  Plaintiff also shopped in stores, by the phone, and via the

computer.  (R. 447.)  In addition, Plaintiff claimed that he talked on the phone, emailed,

and visited family and friends on a daily to weekly basis and that he regularly went to

family and friends' houses.  (R. 448.)  Plaintiff asserted that he had a five-pound weight

restriction.  (R. 449.)  He was limited as to squatting, bending, reaching, kneeling, and

grasping.  (R. 449.)  He claimed he could walk half a mile before needing rest, stand for

10-30 minutes, and sit for half an hour.  (R. 449.)  Plaintiff noted that he was able to

handle stress very well, noting that he did have financial stress.  (R. 450.)  Plaintiff

further represented that his medications did not cause him any side effects.  (R. 451.)

On March 18, 2016, Plaintiff had a follow-up with Mark Janiga, M.D., during

which Plaintiff reported moderate improvements with pain medication management,

approximately a 35% improvement, with no sedation or any evident intoxication or

reduced concentration.  (R. 1702, 1704.)  Plaintiff's gait was normal upon examination

and there was no reduction in reflexes.  (R. 1704-05.)  Dr. Janiga characterized Plaintiff's

functioning as improved.  (R. 1705.)

On March 24, 2016, Plaintiff underwent an independent medical examination by

Matthew Monsein, M.D.  (R. 1662.)  Plaintiff was not in distress and had some

nonspecific tenderness over the cervical and paralumbar regions, mild restriction in

18

cervical range of motion, and was somewhat restricted as to his lumbar region.  (R. 1666.)  Plaintiff's gait was normal, as was his straight leg raising.  (R. 1665.)  However, Dr. Monsein did not believe the decreased range of motion was truly an objective finding in light of guarding behaviors.  (R 1674.)  Plaintiff also showed no weakness in the upper extremities.  (R. 1665.)  Dr. Monsein recommended a complete taper off morphine and oxycodone as they could result in pain.  (R 1676.)  He noted an absence of attempts to utilize behavioral or cognitive approaches to manage chronic pain and a noncompliant course of physical therapy.  (R. 1673-74.)  Dr. Monsein believed that the objective findings for Plaintiff's claimed pain were minimal, further noting that his neurological examinations had always been unremarkable.  (R. 1674.)  Dr. Monsein opined that one could argue that the decreased range of motion found in the record was not an objective finding, but was a consistent finding throughout the examinations performed on Plaintiff.  (R. 1674.)  The primary finding was guarding with a decreased cervical range and that any limitation on improvement was due to Plaintiff's subjective complaints.  (R. 1674.)  Instead of medications, Dr. Monsein recommended a cognitive behavioral approach to Plaintiff's pain, but noted that "that all concerned parties realize that the purpose of this type of program would not to be 'lessen his pain,' but rather to improve functional activity levels in spite of his subjective experience of chronic pain."  (R. 1676.)

On April 22, 2016, Dr. Janiga reported that Plaintiff was doing "okay" with moderate improvements on medication, but was having a hard time sleeping.  (R. 1707.)  Plaintiff's gait was normal upon examination and there was no reduction in reflexes.  (R. 1710.)  On May 16, 2016, Plaintiff reported moderate improvement on pain medications

with no shooting pain.  (R. 1712.)  On June 20, 2016, Plaintiff reported to Dr. Janiga that he was doing well with sustained functional improvements on pain medications, but reported headaches for unknown reasons.  (R. 1718.)  It was noted that Plaintiff never had a neurological workup.  (R. 1718.)  Plaintiff still complained about only sleeping two hours per night.  (R. 1722.)  On July 19, 2016, Plaintiff complained of more neck pain.  (R. 1724.)  On July 25, 2016, Dr. Janiga noted an improvement in pain control.  (R. 1729.)  Plaintiff had a normal gait and claimed tenderness upon palpitation of the cervical muscles.  (R. 1728.)  Again, on August 18, 2016, Plaintiff reported that he was doing "okay" with moderate improvement in function as a result of the prescribed medications.  (R. 1743.)  Plaintiff was not sure about the effectiveness of the cervical medial branch blocks.  (R. 1743.)

On May 8, 2016, a state agency physician, Charles Grant, M.D., opined that Plaintiff had an RFC to occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds.  (R. 77.)  In addition, Dr. Grant believed that Plaintiff could stand or walk with normal breaks for a total of 6 hours per work day and sit 6 hours per work day.  (R. 77.)  Plaintiff had an unlimited ability as to push and/or pull activities other than for lifting and carrying.  (R. 95-96.)  On reconsideration, Gregory H. Salmi, M.D. came up with a similar RFC for Plaintiff.  (R. 95-96.)

An October 2016 cervical spine MRI and CT showed normal alignment, solid-appearing fusion, and no more than mild to moderate foraminal narrowing with no evidence of stenosis, cord compression, or signal abnormality, and mild degenerative changes.  (R. 1815-17.)

20

At the hearing before the ALJ, the Medical Expert ("ME") testified in relevant part as follows:

Sure.  Well, this gentleman has disc disease involving the cervical spine, which has been treated with a fusion and that failed to immobilize the C6, 7. So, they had to go back a year later in 2015 to tighten it up.  As far as I'm aware, it's a stable fusion now and there is no clear evidence on the MRI of the cervical spine that there is any nerve root compression.  And I didn't see any electrical studies in the upper extremities to show that there was any electrical abnormality or evidence of radiculopathy.  The lower back, there was an MRI done.  I have written 3/11, I'm not sure if it was 3/11/15, '16 But it showed a herniation without stenosis or nerve root compression at L5/Sl.  But the patient does have radiculopathy.

Now, the problem with radiculopathy is unless there is clear evidence of loss of reflex or change of reflex or atrophy of muscles in the area which is affected, one can confirm that clinically and that's where electrical studies are very useful.  So, it would be -- I didn't see, unless I missed it in some of the earlier files, that there was an MRI of the upper or lower extremities, which would certainly give us definite proof as to whether there is or is not nerve root compression.

Certainly, I didn't see that.  I looked in detail in 32-F, which is an extensive review I presume by an orthopedic surgeon, though, it doesn't say that.  It's an independent medical examination done on 3/16/16.  It doesn't have a really satisfactory physical examination, which is on Page 4.  But he sees no weakness in the upper extremities and some restriction in the mobility of the lower spine, but no straight leg raising positivity or any other neurological abnormalities.

So, he didn't find any clear evidence of nerve root-problems secondary to nerve root compression.  He also reviewed the medicines that the claimant has been on and he questioned, as I often do, if narcotics are used to help the patient, if they don't help him to restore them to a more normal capacity such that they can do normal activities and perhaps work, is it really fruitful to continue them.  Certainly, they are habit forming.

So, this doctor was suggesting tapering narcotics, trying some other means of controlling the pain.  And certainly, the objective evidence, on the imaging and clinically, are not very convincing that there is a significant neurologic consequence of nerve root compression.  So, that the treatment is perhaps very strong for something that shouldn't require that much.  One can never

measure how much pain that patient is suffering from, but one looks for objective evidence of pathology.

And when it comes to the spine, that would be reflex changes, sensory changes, atrophy of muscles, objective ambulatory disturbances. And when it's difficult to judge from-- clinically, electrical studies are very helpful as they clearly show that there is damage to cervical and/or lumbar nerves, that gives more validity to what sometimes can be difficult to evaluate clinically.

And I didn't see any of those studies done. So, we have to depend upon what the claimant tells us in terms of his functional capacity since we cannot objectively measure what he's able to do. But the few examinations I've seen have not shown, for the lower back, straight leg raising being positive or any changes in reflexes. And the upper extremities pretty much the same.

And the MRI, the most recent MRI of the cervical spine, does not conclusively show that there is nerve root compression. Then, there might be some canal stenosis, but no nerve root compression. And if it's a question, then, electrical studies can answer that. So, I -- in terms of what the patient says he is functionally capable of, that would be difficult to – that would be difficult for me to determine what he can do. It sounds like he's almost at sedentary.

I would think, if he could do light work, I mean, he would have to be on his feet for two to four hours in an eight-hour day. And I didn't understand how he couldn't stand for 30 minutes, but he could walk for I think he said half a mile. But generally, walking would be more painful than just standing still. In any event, without any confirmatory evidence about the degree of severity of the nerve root impingements, I would put him into a category of light work.

And he certainly is de-conditioned because he has not been working for a period of time. And that would mean -- no. I think he said he couldn't lift more than five pounds. That's mind boggling. I would think, with the objective evidence we have, he should be capable of lifting ten pounds frequently, lifting and carrying 20 pounds occasionally.

We have no evidence of significant low back pathology. If he had significant lumbosacral disease, then, lifting something 20 pounds worth would put pressure on the nerves and the affected area where there is nerve root impingement. But we have no evidence of that objectively and we have no electrical studies to confirm that there is any problem with the lumbosacral spine.

So, I don't see why he would not be able to tolerate that and to be on his feet for three or four hours and sitting for six to eight hours. Climbing ramps and stairs I think could be done occasionally. Climbing ladders and scaffolds, no, he's on narcotics, on Lyrica, Baclofen, all things which could impair his coordination and balance.

In terms of stooping, kneeling, crouching, I think that could be done occasionally, maybe more often, but I'm going by what his complaints are, not by the objective evidence. And crawling I would say never particularly with -- keep in mind that he did have cervical surgery. In terms of the extremities, I think he should be able to frequently reach from waist to chest and above to the shoulders occasionally.

But part of that is simply because he's de-conditioned and repeated frequent lifting of the arms that high might be too strenuous. I didn't mention pushing and pulling, I think he could have limited pushing and pulling with the upper and lower extremities, again, limitations largely from de-conditioning. In terms of handling, fingering, and feeling, I would see no limitations. There's no evidence that he has any peripheral neuropathy.

(R. 47-51.)

On examination by Plaintiff's attorney, the ME noted Plaintiff's chronic pain, but concluded that there were no objective findings to support the level of pain claimed. (R. 54-57.)

The ALJ then provided the Vocational Expert ("VE") with the following hypothetical person:

Let's assume the person is limited to sedentary level work activity, a sitdown job; would be limited to only occasional use of ramps and stairs. The person would not be able to work at a job that involved ladders or ropes or scaffolds; only occasional stooping or kneeling or crouching. The person would never be able to work at a job that involved crawling.

The person would not be able to work at unprotected heights or dangerous exposed moving machinery. The person would only be able to occasionally reach above the shoulders; only occasional pushing and pulling.

(R. 58.)

Based on this hypothetical, the VE, using as a guide the Dictionary of Occupational Titles ("DOT"), opined that while the hypothetical individual could not perform Plaintiff's past work as a truck driver, the hypothetical person could perform other work existing in significant numbers in the national economy, including as an information clerk (DOT 237.367-022), bonder (DOT 726.685-066), and optical assembler (DOT 713.687-018).  (R. 58-59.)  The VE also opined that person who came in late, left early, or missed more than two days per months consistently could not perform these jobs.  (R. 59.)  A person that was not on-task for more that 10 percent of the day could also not perform this work.  (R. 59-60.)

### III.   LEGAL STANDARD

Judicial review of the Commissioner's denial of benefits is limited to determining whether substantial evidence on the record as a whole supports the decision, 42 U.S.C. § 405(g), or if the ALJ's decision resulted from an error of law.  *Nash v. Comm'r, Soc. Sec. Administration*, 907 F.3d 1086, 1089 (8th Cir. 2018) (citing 42 U.S.C. § 405(g); *Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018)).  "Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's conclusions."  *Id.* (quoting *Travis v. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007)).  The Court "considers evidence that detracts from the Commissioner's decision as well as evidence that supports it."  *Id.*  As the Supreme Court recently explained:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency's factual determinations. And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence . . . is more than a mere scintilla. It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

"In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status." *See Pyland v. Apfel*, 149 F.3d 873, 876–77 (8th Cir. 1998); *see also* 42 U.S.C. 416(i)(3); 20 C.F.R. § 404.130; *Rasmussen v. Shalala*, 16 F.3d 1228 (8th Cir. 1994) ("To qualify for disability benefits, Rasmussen had to prove that, on or before the expiration of his insured status, he was unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which was expected to last for at least twelve months or result in death.") (citation omitted). A non-disabling condition, which later develops into a disabling condition after the expiration of a claimant's insured status, cannot be the basis for an award of disability benefits under Title II. *See Thomas v. Sullivan*, 928 F.2d 255, 260-61 (8th Cir. 1991). It is not enough that the impairments existed before the date a claimant's insured status expired; the impairments must have been disabling at that time. *See* 20 C.F.R. § 404.131(a). Evidence of a disability subsequent to the expiration of one's insured status can be relevant, however, in helping to elucidate a medical condition during the time for which benefits might be rewarded. See *Pyland*, 149 F.3d at 877 (citing *Fowler v. Bowen*, 866 F.2d 249, 252 (8th Cir. 1989)).

Plaintiff was insured through December 31, 2016 (R. 25); therefore, he must show that his disability began before the end of his insurance period, and existed for twelve continuous months to receive benefits. *See* 42 U.S.C. §§ 423(a)(1)(A), (c)(1)(B), (d)(1)(A); 20 C.F.R. §§ 404.101(a), 404.131(a).

## IV.   <u>DISCUSSION</u>

Plaintiff makes several challenges to the ALJ's determination as part of his Motion for Summary Judgment for the period he was insured.  First, Plaintiff argues that the ALJ erred in finding that the only severe impairments he suffered from were degenerative disc disease; headaches; and degenerative joint disease.  (Dkt. 1-1 at 1-2; Dkt. 17 at 4.)  Second, Plaintiff argues the ALJ erred by not giving sufficient weight to his treating provider and instead giving weight to biased independent medical experts who are not doctors and are paid by the Government or an insurance company, which also involved short examinations.  (Dkt. 1-1 at 2-3, 5, 6, 8, 9, 11; Dkt. 17 at 3.)  Third, Plaintiff argues that the ALJ failed to give proper weight to his subjective complaints, including his pain and headaches.  (Dkt. 1-1 at 3, 7; Dkt. 17 at 4.)  Fourth, Plaintiff challenges the ALJ's reliance on the neurology report from Dr. Bajwa on the grounds that no neurological examination ever took place, and otherwise sought to explain other medical notes in the record that he asserted are incomplete or otherwise should be corrected.  (Dkt. 1-1 at 4, 5, 6, 7-8, 11.)  Fifth, Plaintiff challenges the RFC assigned to him by the ALJ.  (Dkt. 1-1 at 3, 12; Dkt. 17 at 2-4.)  Sixth, Plaintiff argues that the ALJ discriminated against him based on his age.  (Dkt. 1-1 at 11; Dkt 17 at 3, 4.)  Seventh, Plaintiff challenges the hypothetical provided to the VE on the ground that it did not adequately address his

limitations and asserts that the ALJ ignored the fact that the VE stated that none of the

jobs listed allowed the level of absences or the necessary accommodations for being able

to perform the positions.  (Dkt. 1-1 at 11-12; Dkt. 17 at 3, 4.)  Eighth, Plaintiff argued

that the "DOT book is OUTDATED and the jobs were never proven to actually exist by

the VE nor the ALJ" and that he did not have the proper training for these jobs.  (Dkt. 17

at 3, 4.)  In addition, Plaintiff attached two additional years of medical records for this

Court's consideration.  (Dkt. 17 at 4; Dkt. 19.)  The Court addresses each of these

arguments.[3]

## A.      New Evidence and Challenges to the Existing Record

Plaintiff seeks to add 70 pages of new documents to the record and challenges the

content of a number of the medical records already in the record.  (Dkt. 19.)  The

documents he seeks to add are dated from 2018 through 2020.  (*Id.*)  The Eighth Circuit

has concluded that a district court's consideration of evidence outside of the

record before Commissioner is generally precluded; remand is warranted only upon

showing that new evidence is material, *i.e.*, non-cumulative, relevant, and probative of

claimant's condition for the time period for which benefits were denied.  *See Jones v.*

*Callahan*, 122 F.3d 1148, 1154 (8th Cir. 1997); *see also* 42 U.S.C. § 405(g).  In addition,

a claimant seeking to add the new evidence must demonstrate good cause for not having

incorporated the new evidence into the administrative record.  *See Hinchey v. Shalala*, 29

---

[3]      Plaintiff made also made a number of arguments not related to the period he was
insured or otherwise relevant to this Court's review of the five-step process as they are
without merit, or are otherwise subsumed within the above categories of arguments.

F.3d 428, 432-33 (8th Cir. 1994) (citation omitted) (finding that good cause is lacking

where claimant could have obtained evidence before the administrative record was

closed).  Here, Plaintiff himself did not submit this evidence to the Appeals Council

along with his request for review of the ALJ's decision, even after the Appeals Council

granted him two extensions of time to submit additional evidence as part of his request

for review.  (R. 6-8, 215-226, 254-255.)  The Appeals Council issued its decision in July

2019, and Plaintiff has provided no reason why documents before this period could not

have been  provided to the Appeals Council.  In addition, Plaintiff has not explained why

he could not have brought any competent evidence other than his own assertions

challenging the veracity of the existing medical records to the ALJ or the Appeals

Council.  Moreover, Plaintiff has provided no basis as to why documents generated well

after the last date of insured in 2016 are relevant to a finding of disability in this case.

For all of these reasons, Plaintiff's attempt to supplement the record is rejected.

**B.**     **The ALJ's Decision with Respect to Plaintiff's Severe Impairments During the Period Insured.**

Plaintiff argues that, had the Commissioner reviewed his complete file, he would

have found more than three severe impairments.  (Dkt. 1-1 at 1.)  Plaintiff asserted that

the medical record supports the following conditions and impairments:

> [B]ack, neck, shoulder, elbow, knee, anxiety disorder, depression, arthritis,
> high blood pressure, slight obesity, opioid dependence, insomnia
> gastroesophageal reflux disease, cervical spondylosis, cervical post
> Laminectomy syndrome, cervical radiculopathy, cervicogenic headache,
> muscle spasms of head, chronic pain, chronic headaches (migraines),
> degenerative disc disease, other spinal diseases that I cannot recall the
> terminology for, but they are listed in medical records, ruptured disc, and
> numerous other limitations as documented in all of my weight restrictions

and restrictions limiting me to very little or no doing of things but not limited to lifting, carrying, reaching, bending, squatting, kneeling, grasping, being on elevated heights, walking, sitting, lying down, and others.

(Dkt. 17 at 4.)  As stated previously, the ALJ concluded as follows with respect to severe impairments:

> The undersigned finds all impairments other than those enumerated above, alleged and found in the record, are non-severe or not medically determinable as they have been responsive to treatment, cause no more than minimal vocationally relevant limitations, have not lasted or are not expected to result in more than minimal work-related restriction for a continuous period of at least 12 months, are not expected to result in death, and/or have not been properly diagnosed by an acceptable medical source as defined in the Regulations (20 CFR 404.1502, 404.1509, 404.1521 and 404.1522(a)). The state agency finds anxiety is a nonsevere impairment.  A May 17, 2016 consultative examination with John O'Regen, Ph.D., showed evidence of stress related to chronic pain and financial difficulties, but no signs of a psychiatric illness. (Exhibit 33F)  A review of evidence shows no good workup and/ or treatment of mental health issues.

(R. 16-17.)

At Step Two of the sequential analysis, the ALJ is required to determine whether a claimant's impairments are severe.  *See* 20 C.F.R. § 404.1520(c).  At step two, the claimant must show he has an impairment or combination of impairments that significantly limits his ability to work in most jobs.  *See Bowen v. Yuckert,* 482 U.S. 137, 146 (1987) (quoting 20 C.F.R. §§ 404.1520(c), 404.1521(b)).  To rise to the level of "severe," the impairment must have lasted or be expected to last for a continuous period of at least 12 months.  *See* 20 C.F.R. § 404.1509.  A claimant's "age, education, and work experience" are not relevant to the step two inquiry.  *See* 20 C.F.R. § 404.1520(c). Instead, "medical evidence alone is evaluated in order to assess the effects of the impairment(s) on ability to do basic work activities."  SSR 85-28, 1985 WL 56856, at *4

29

(S.S.A. 1985).  While "severity is not an onerous requirement for the claimant to meet . . . it is also not a toothless standard."  *Wright v. Colvin,* 789 F.3d 847, 855 (8th Cir. 2015) (citations omitted).  An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities.  *See Bowen*, 482 U.S. at 153.  If the impairment would have no more than a minimal effect on the claimant's ability to work, then it does not satisfy the requirement of step two.  *See Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (citations omitted).  Further, "[t]o support the award of disability benefits, a disease must have progressed from latency to a level constituting severe impairment as defined under Title II **before the expiration of the insured period**."  *List v. Apfel*, 169 F.3d 1148, 1149 (8th Cir. 1999) (emphasis added) (citing *McClain v. Bowen*, 848 F.2d 892, 894 (8th Cir. 1988)).

As starting point, it is important to note that the burden is on Plaintiff to establish the severity of his impairments.  *See Mistelle S. v. Saul*, No. 19-CV-01153 (SRN/HB), 2020 WL 3405437, at *3 (D. Minn. June 2, 2020), *R.&R. adopted*, 2020 WL 3402432 (D. Minn. June 19, 2020).  Plaintiff fails to provide any citation in the over 1900-page record to support his myriad of claimed severe impairments, and the Court has no duty to search the record for that support.  *See Breidenich v. Saul*, No. CV 19-11074, 2020 WL 5521409, at *3 (E.D. Mich. Aug. 24, 2020), *R.&R. adopted sub nom.*, 2020 WL 5514195 (E.D. Mich. Sept. 14, 2020); *see also ASARCO, LLC v. Union Pac. R. R. Co.*, 762 F.3d 744, 753 (8th Cir. 2014) ("Judges are not like pigs, hunting for truffles buried in briefs or

the record." (internal quotation marks omitted)).  On this basis alone, the Court rejects Plaintiff's argument at Step Two.

Moreover, based on what the Court can discern based on Plaintiff's pro se arguments and the available record, the Court finds no remandable error at Step Two.

With respect to Plaintiff's assertion that his migraines should have been considered a severe impairment, the Court notes that the record does not set forth a diagnosis of migraines during the period Plaintiff was insured.  While there was mention of medication for use with severe migraines (R. 1906), there is no corresponding diagnoses outside of his assertion of headaches, and on two occasions in 2015, Plaintiff noted that he was not suffering from migraines.  (R. 1262, 1284.)  Similarly, there is no diagnosis  that this Court can find with respect to obesity in the record during the period that Plaintiff was insured or as to his claimed head muscle spasms (with an onset date of March 2017 (R. 1761)).  As to Plaintiff's claim of arthritis, substantial evidence supports a finding that he did  not experience  severe active arthritis during the relevant period. (*See, e.g.*, R. 1652, 1699.)

In addition, Plaintiff complained that the ALJ did not consider his elbows, however, the Court can discern no such impairment from the available record.  Indeed, the only pertinent records that the Court could find mentioned that in August 2013, Plaintiff's elbow flexion and extension were normal bilaterally.  (R. 661, 676.)

Plaintiff also asserts ankle problems arising out of a motorcycle accident.  (Dkt. 1-1 at 10.)  However, there are simply no documents in the record supporting a severe impairment to Plaintiff's ankles during the period he was insured.  In March 2011,

Plaintiff's ankles had a full and painless range of motion. (R. 872.) In August 2013 it was reported that the flexion of Plaintiff's ankles was normal. (R. 661.) Further, in October 2013, it was also noted that Plaintiff's ankle reflexes were symmetric. (R. 1445.)

It is also important to note that a diagnosis alone is insufficient to establish a severe impairment at Step Two. *See Mistelle S.*, 2020 WL 3405437, at *3 (citations omitted). While the record contains mentions of acid reflex (*see, e.g.*, R. 659), the record shows no esophagitis (R. 1773), and in any event Plaintiff has not set forth how this kept him from doing basic work activities. Likewise, while there is no dispute that Plaintiff suffered from high blood pressure (*see, e.g.*, R. 1257, 1527, 1652) there is no indication of any treatment sought for this condition or any medication used to control this condition, or how it impeded his ability to doing any work activities. *See Estes v. Barnhart*, 275 F.3d 722, 725 (8th Cir. 2002) ("An impairment which can be controlled by treatment or medication is not considered disabling."). Moreover, there is no indication of any organ damage caused by his blood pressure. *See Murphy v. Sullivan*, 953 F.2d 383, 386 (8th Cir. 1992) ("Finally, the claimant's high blood pressure, which registered 170/90 at its highest recorded point, fails to rise above the moderate level. Such a reading, even without medication, 'does not qualify as a severe impairment under the Secretary's regulations, because it has not resulted in any end organ damage (i.e., to the heart, eye, brain, or kidney).'") (quoting *Brown v. Heckler*, 767 F.2d 451, 453 (8th Cir. 1985). As to his sleep deprivation, while Plaintiff reported not being able to sleep, he traditionally did not need a lot of sleep, and he has not identified any support in the

record demonstrating how this impeded his ability to engage in basic work activities.  (R. 1679-80.)

With respect to Plaintiff's claims of depression and anxiety, Plaintiff argues that the fact that the Commissioner had him examined related to his mental health is proof that these conditions amount to a severe impairment.  (Dkt. 1-1 at 2.)  As part of an assessment checklist, Plaintiff self-reported varying levels of anxiety or depression, albeit it is unclear which condition he was referring to, where his reports ranged from not suffering from the condition(s), as well as to being slightly, moderately or severely impacted by the condition(s).  (*See*, *e.g.*, R. 975, 1006, 1025, 1047, 1056, 1257, 1262, 1277, 1284, 1512, 1605.)  While it was noted in 2014 that Plaintiff's medications included Valium for anxiety and Hydroxyz Pam, Dr. Wicklund opined that there was no need for anti-anxiety medications.  (R. 1474-75.)  Indeed, the Court can discern no diagnosis of anxiety or depression in the record during the relevant period.  In January 2015, Dr. Janiga noted that Plaintiff had no overt depression or anxiety and that as a part of his medical history he denied a history of generalized anxiety or a history of moderate or severe depression.  (R. 1649-95.)  In his evaluation with Dr. O'Regan, Plaintiff represented that he was depressed and that he had some anxiety due to financial difficulties, but that he tried to stay positive.  (R. 1680.)  His examination showed no signs of psychiatric illness, with some distress due to chronic pain and financial difficulties, and his prognosis was good. (R. 1684.)  Further, in 2016, Plaintiff reported no history of depression or anxiety.  (*See, e.g.*, R. 1696, 1727, 1742, 1746.)  In sum,

substantial evidence in the record supports the ALJ's decision not to assess Plaintiff with anxiety or depression as a severe impairment.

With respect to Plaintiff's claims of chronic opioid dependence, while there was an assertion of dependence with an onset date of March 14, 2017, after the insured period (R. 1757), and no dispute as to his use of opioid pain medications, the record shows there was no opioid intoxication (*see*, *e.g.*, R. 1704, 1711, 1723, 1728, 1899), and Plaintiff himself asserted that his medications did not affect his ability to engage in daily activities, as they caused him no side effects (R. 451).

As to Plaintiff's knee problems, there is no dispute that he had surgery in 1999 for a meniscus tear in his knee. (R. 763.) A November 2001 orthopedic record showed that Plaintiff reported full resolution of the right knee and x-rays of the knees were unremarkable. (R. 832-833, 1201-1202.) Plaintiff only reported "some pain" in both knees as of August 6, 2013, but was able to stand and walk without difficulty, and his knee flexion and extension were normal bilaterally. (R. 659-661.) An examination of his knees on October 28, 2013 was normal despite his complaint of pain. (R. 1443-47.) In March 2014, it was noted that there was no permanent injury to his knee. (R. 1474.) In sum, the Court finds that substantial evidence supports the finding by the ALJ not to assess a condition relating to his knees as a severe impairment.

As to Plaintiff's claimed back issues, shoulder impairment, cervical spondylosis, cervical post Laminectomy syndrome, cervical radiculopathy, cervicogenic headache, and chronic pain, the Court finds that the cervical spondylosis, cervical post Laminectomy syndrome, cervical radiculopathy, cervicogenic headache can be subsumed

within the degenerative disc disease, headaches and the degenerative joint diseases identified by the ALJ at Step Two as severe impairments. (R. 16.) Even to the extent that they are not subsumed within these impairments, to the extent that these conditions, as well as his claimed shoulder impairment and chronic pain, should have been characterized as severe impairments, this would not end the analysis, as the Court would need to determine whether such an error is harmless. In *Nicola v. Astrue*, 480 F.3d 885 (8th Cir. 2007), the plaintiff contended that she was disabled, in part, due to borderline intellectual functioning. *Id.* at 886. On appeal, the claimant "assert[ed] that the ALJ erred in failing to include her diagnosis of borderline intellectual functioning as a severe impairment at step two of the sequential analysis." *Id.* at 887. Although the Commissioner in *Nicola* conceded that the plaintiff's borderline intellectual functioning should have been considered a severe impairment, the Commissioner argued that the ALJ's error was harmless. *Id.* The Court of Appeals for the Eighth Circuit "reject[ed] the Commissioner's argument of harmless error," noting that "[a] diagnosis of borderline intellectual functioning should be considered severe when the diagnosis is supported by sufficient medical evidence." *Id.*

Courts have been split regarding whether an error at step two can be harmless. "Some Courts have interpreted *Nicola* to mean that an error at step two can never be harmless." *Lund v. Colvin*, No. 13-cv-113 JSM, 2014 WL 1153508, at *26 (D. Minn. Mar. 21, 2014) (collecting cases); *see also Moraine v. Soc. Sec. Admin.*, 695 F. Supp. 2d 925, 956 (D. Minn. 2010) ("The Court of Appeals for the Eighth Circuit has held that an ALJ's erroneous failure, at Step Two, to include an impairment as a severe impairment,

will warrant a reversal and remand, even where the ALJ found other impairments to be severe.").  Other courts, including other courts in this District, have refused to interpret *Nicola* as establishing a *per se* rule that any error at step two is a reversible error.  *See Lund*, 2014 WL 1153508, at *26 (collecting cases).

In the absence of clear direction from the Eighth Circuit, the prevailing view of courts in this District has been that an error at step two may be harmless where the ALJ considers all of the claimant's impairments in the evaluation of the claimant's RFC.  *See, e.g., Rosalind J. G. v. Berryhill*, No. 18-cv-82 (TNL), 2019 WL 1386734, at *20 (D. Minn. Mar. 27, 2019) ("Consistent with the prevailing view in this District, any potential error by the ALJ in not including Plaintiff's chronic pain syndrome as a severe impairment at step two was harmless based on the ALJ's consideration of the intensity, persistence, and functional effects of Plaintiff's pain when determining her residual functional capacity."); *David G. v. Berryhill*, No. 17-cv-3671 (HB), 2018 WL 4572981, at *4 (D. Minn. Sept. 24, 2018); *Tresise v. Berryhill*, No. 16-cv-3814 (HB), 2018 WL 1141375, at *5 (D. Minn. Mar. 2, 2018) ("Courts in this district have followed the approach set forth in *Nicola* and determined that reversal based on errors at step two is only warranted when the ALJ fails to consider the omitted impairments in the RFC."); *Lorence v. Astrue*, 691 F. Supp. 2d 1008, 1028 (D. Minn. 2010) ("The ALJ's failure to include adrenal insufficiency as a severe impairment was not by itself reversible error, because the ALJ continued with the evaluation of Plaintiff's pain and fatigue in determining Plaintiff's residual functional capacity.") (citation omitted).  Such a finding is consistent with the Commissioner's regulations.  *See* 20 C.F.R. § 404.1545(a)(1)-(2)

(an ALJ must consider all relevant evidence, including non-severe impairments, in his RFC determination).

Even if it were error to omit the above impairments or the combination thereof at Step Two, it would not have affected the outcome with respect to the RFC analysis given the ALJ considered the back problems, cervical impairments, the claimed shoulder issues, and his complaints of pain as part of his RFC analysis.[4]  (R. 18-26.)

As such, the Court finds no basis to remand at Step Two and proceeds with determining whether the assigned RFC is supported by substantial evidence.

**C.     The Weight Assigned to the Treating Physician's Opinion and the ALJ's RFC**

Plaintiff argues that pursuant to his treating medical provider Dr. Sinicropi, he cannot sit or stand for more than 30 minutes at a time or lift more than 5 pounds and that he would miss three or more days of work per month, and that the ALJ erred by failing to give Dr. Sinicropi's opinion appropriate weight as to those limitations instead of the opinions of medical experts who are paid by Defendant and who never examined him. (Dkt. 1-1 at 2-3, 11; Dkt. 17 at 3.)

As set forth previously, Dr. Sinicropi opined that Plaintiff could walk or stand a total of two hours out of an eight-hour workday with a change of position.  (R. 1293.)  It was noted that Plaintiff could stand 30 minutes, walk 15 minutes, and then change position to relieve pain.  (R. 1293.)  Dr. Sinicropi believed that Plaintiff would need to be

---

[4]     The Court notes that the ALJ also considered the claimed knee impairment as part of his RFC analysis.  (R. 25.)

allowed to lie down as needed to relieve pain.  (R. 1294.)  Dr. Sinicropi went on to opine

that Plaintiff could only occasionally lift 1-5 pounds with no heavier weights allowed;

could never balance, flex his neck, rotate his neck, or reach with his hands; and could

rarely handle or use fingering using his hands.  (R. 1295.)  Plaintiff did not need any

assistive device to walk or stand.  (R. 1296.)  According to Dr. Sinicropi, Plaintiff was

likely to be absent from work more than three days per month.  (R. 1296.)

As it relates to the opinions of Dr. Sinicropi, the ALJ found as follows:

On April 25, 2014, Dr. Sinicropi offered a medical source statement
supporting total disability to at least July 1, 2014, but then making specific
findings of lifting 5 pounds occasionally, sitting 2 hours of an 8-hour day, 30
minutes at a time, standing and/or walking 2 hours of an 8-hour day, standing
30 minutes at a time and walking 15 minutes at a time, allowing changes of
position and the option to lie down as needed per claimant report, avoiding
balancing, stooping, posturing of the neck, repetitive use of the hands, rare
use of the hands for handling and fingering, and an expectation of more than
3 absences from work per month. (Exhibits 21F, pages 2 to 8, and 44F, pages
31 to 37).  The undersigned gives little weight to this opinion as not supported
by objective findings or good explanation.  Specifically, a review of records
shows no good or ongoing neurological losses in the upper or lower
extremities.  Dr. Sinicropi's opinion also considers subjective reports.

(R. 23.)

Instead, the ALJ gave more weight to Dr. Stein[5] and the state agency medical

consultants:

In assessing the residual functional capacity, the undersigned affords the
greatest weight to the opinion of the medical expert because of his medical
specialization, his familiarity with the disability evaluation process, and the
opportunity to review the entire record and give good explanation for the
opinion.  Dr. Stein reviewed the entire record noting no clear evidence of
nerve root compression to support listing 1.04.  Dr. Stein noted no ongoing

---

[5]     While Plaintiff argues that the ME is not doctor (Dkt. 1-1 at 3), the record shows
that he is a medical doctor.  (R. 1752.)

neurological losses, no EMG evidence, and no straight leg changes to support a lifting limit of 5 pounds. The undersigned also affords weight to the opinions of the state agency consultants because these opinions are generally supported by the record; however, greater weight is given to the opinion of the medical expert because he reviewed the entire record as it existed at the hearing level. (Exhibits 1A and 4A). The residual functional capacity accounts for limits in lifting, weight bearing, overhead reaching, and postural activities. The hazard precautions also accommodate for effects of medication although Dr. Janiga found no inconsistencies or evidence of medication intoxication.

(R. 25-26.)

"A disability claimant has the burden to establish her RFC." *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). The Eighth Circuit has held that "a 'claimant's residual functional capacity is a medical question.'" *Id.* (quoting *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)). "'[S]ome medical evidence' must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace.'" *Id.* (quoting *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam)). However, "there is no requirement that an RFC finding be supported by a specific medical opinion." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016) (citing *Myers v. Colvin*, 721 F.3d 521, 526-27 (8th Cir. 2013); *Perks v. Astrue*, 687 F.3d 1086, 1092-93 (8th Cir. 2012)). Rather, the RFC should be "based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." *Id.* (quoting *Myers*, 721 F.3d at 527). "Moreover, an ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." *Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010) (citation omitted) (highly unlikely that ALJ did

not consider and reject physician's opinion when ALJ made specific references to other findings set forth in physician's notes).

"A treating physician's opinion is generally given controlling weight, but is not inherently entitled to it. An ALJ may elect under certain circumstances not to give a treating physician's opinion controlling weight. For a treating physician's opinion to have controlling weight, it must be supported by medically acceptable laboratory and diagnostic techniques and it must not be 'inconsistent with the other substantial evidence in [the] case record.'" *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006) (quoting 20 C.F.R. § 404.1527(d)(2)) (citing *Goff*, 421 F.3d at 790; *Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005)). "A treating physician's own inconsistency may also undermine his opinion and diminish or eliminate the weight given his opinions." *Id.* (citing *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)); *see also Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012) ("However, '[a]n ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions.'") (quoting *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010)) (alteration in original) (internal quotation omitted). Moreover, "a treating physician's opinion that a claimant is disabled or unable to work, does not carry any special significance, because it invades the province of the Commissioner to

make the ultimate determination of disability."[6] *Davidson v. Astrue*, 578 F.3d 838, 842

(8th Cir. 2009) (cleaned up).

Based on a careful review of the record, the Court concludes that the ALJ gave

appropriate weight to the opinion of Dr. Sinicropi given the conflict in his records, the

conflict with the objective medical record as a whole, and the conflict as it relates to

Plaintiff's claimed activities.

During the period in which Plaintiff was contemplating surgery for the injury for

which he claimed workers' compensation, Plaintiff underwent a neurological consultation

with Dr. Bajwa in September 2012 regarding neck and back pain as a result of the

December 2010 accident.  (R. 492.)  Dr. Bajwa noted that the examination was

unremarkable and while he thought Plaintiff might need to modify his work type, he did

not think Plaintiff was "truly completely disabled."  (R. 492-494).  The MRI of the

lumbar spine showed only moderate disk degeneration without stenosis or neural

compression, while the MRI of the cervical spine showed a small AP central canal,

pseudo spondylosis, and C7 nerve root impingement with cord compression.  (R. 492-93,

536, 538.)  Further, Plaintiff showed no extremity weakness and had a normal gait.  (R.

492-93.)

Similarly, Dr. Larkins' October 31, 2011 medical evaluation of Plaintiff showed

normal extremity reflexes and strength, and he was able to walk and squat.  (R. 509.)

Plaintiff also showed a full range of motion of his cervical spine.  (R. 510.)  Dr. Larkins

---

[6]     As such, the ALJ committed no error in not giving Dr. Sinicropi's off-work notes
or other assertions that Plaintiff was disabled any special weight.

opined that Plaintiff was capable of working and performing short hauls without lifting or bending, but was incapable of long-distance multi-state trucking hauls. (R. 510). Dr. Larkins noted the absence of hard findings to support proceeding with cervical fusion. (R. 504).

Yet despite these opinions and objective findings on examination, Dr. Sinicropi proceeded with surgery based on a moderate cervical stenosis with mild to moderate cord compression and Plaintiff's assertions of pain. (R. 759.) Even upon discharge from the operation, the only restriction was to avoid any heavy bending or lifting, as opposed to the more severe restrictions later imposed by Dr. Sinicropi that would have meant that Plaintiff essentially needed to bedridden for at least half of the day. (R. 595.)

As of February 28, 2012, Dr. Sinicropi opined that while Plaintiff complained of continuing symptoms, his symptoms had improved and that his "[r]ange of motion is approximately 75% in all directions. Neurologically, he is intact. No other findings." (R. 920.) On June 26, 2012, Dr. Sinicropi noted that as far as Plaintiff's cervical spine was concerned, he had undergone an uncomplicated fusion and was doing "significantly better." (R. 950.) Based on the lumbar discography, the "L5-S I segment appears to be the primary and sole pain generator associated with his current disability and condition." (R. 950.) Dr. Sinicropi recommended a total lumbar disc replacement. (R. 950.)

However, on November 12, 2012, orthopedic specialist Dr. Wicklund conducted an independent medical examination of Plaintiff. (R. 1450.) Plaintiff reported that his surgical procedure helped his neck complaints and headaches and that his left arm also felt better. (R. 1453.) The examination showed pain in the lower back on palpation and

a limited motion, but was negative to 80 degrees bilaterally on straight leg raising.  (R. 1453.)  His neck showed no tenderness or spasm and neurologically his upper extremities were at normal strength with a slight loss of feeling on the tip of his right thumb.  (R. 1453.)  He was also positive for right shoulder impingement.  (R. 1453.)  Dr. Wicklund believed that Plaintiff had a good prognosis.  (R. 1454.)  Dr. Wicklund noted that Plaintiff had sustained a permanent aggravation to his cervical spine, but opined that "[a]s a result off his anterior cervical fusion, [Plaintiff] has improved and in my opinion can do light duty work full-time as long as he does no repetitive extension of his neck."  (R. 1454.)

Again, on February 7, 2013, Dr. Wicklund opined that before Plaintiff underwent any surgical intervention at the L5-S1 level, he should participate in a supervised strengthening and flexibility program for his lumbar spine.  (R. 1449.)  He saw no indication that a disc replacement in a 39-year-old would be the first recommendation made and noted that when Plaintiff was examined by a neurosurgeon on February 1, 2011, he had a completely normal neurological examination of his lower extremities and lumbar spine.  (R. 1449.)  Dr. Wicklund also noted that the MRI did not support the procedure and that the symptoms were all subjective.  (R. 1449.)

It appears that the cervical surgery needed to be repeated by Dr. Sinicropi in April 1, 2013, but again the only restriction upon discharge was "not to do any heavy bending or lifting."  (R. 621.)  Despite Plaintiff's complaints of pain during the period, on May 14, 2013, Dr. Sinicropi found that Plaintiff was doing "significantly better" with less

frequent headaches. (R. 967.) His physical examination showed that he was neurologically intact with no other findings. (R. 967.)

On August 3, 2016, Dr. Thorvilson noted during Plaintiff's examination that he moved fairly easily about the room, had normal upright posture, normal lumbar lordosis and thoracic kyphosis, a normal gait pattern, and the ability to walk on his heels and toes (R. 660-662). The neurological examination was also normal. (R. 662). Plaintiff showed normal strength in his upper extremities and showed normal flexion and extension in the lower extremities. (R. 661-62.) While it was recommended that he engage in a rehabilitation program, Dr. Thorvilson also noted that Plaintiff's subjective complaints outweighed the objective findings. (R. 663.) Plaintiff was encouraged to continue walking as an aerobic exercise. (R. 664.)

On September 20, 2013, Dr. Sinicropi recommended that Plaintiff engage in high resistance training for his neck and lower resistance exercises for his lumbar region despite his complaints of pain and even with minimal movement. (R. 980.)

Dr. Wicklund also opined as follows:

> It is my opinion that [Plaintiff] would have been disabled from work following his cervical disk surgery for a period of three months. This would be true on both occasions, both after his anterior cervical fusion and after his posterior cervical fusion. I see no indication he would have been disabled from work because of any complaints of right shoulder pain, thoracic back pain, left knee pain or low back pain since October 4, 2011. His disability from work after the cervical spine surgery would have been total for three months and then he would have been partially disabled for another six weeks with restrictions. There would have been no period of total or partial disability because of any other body part. It is my opinion that the December 3, 2010 injury is the substantial contributing factor to his total and partial disability with reference to his cervical spine. Currently, [Plaintiff] needs restrictions with regard to his cervical spine. He should not do repetitive

44

> flexion and extension or rotation of his cervical spine while he works.  He
> can rotate within the normal range of motion noted on my examination.

(R. 1477.)  Dr. Wicklund also found that Plaintiff had reached a maximum medical
improvement with regard to his neck months after his last cervical fusion and reached
maximum medical improvement with regard to any right shoulder complaints, thoracic
spine complaints, left knee complaints, and low back complaints within four months of
the date of his December 2010 injury.  (R. 1447.)

On November 26, 2013, Dr. Sinicropi noted that Plaintiff had solid fusion at C6-
C7 in response to Plaintiff's claims of pain in his neck and headaches.  (R. 780, 981,
999.)

On February 24, 2014, Dr. Wicklund opined that no further treatment of the
cervical spine was necessary given the solid fusion based on the x-rays, and he did not
believe that the trigger point injections would help with pain related to soft tissues and
scar tissue.  (R. 1473.)  Dr. Wicklund also opined in March 2014 that Plaintiff did not
need narcotics to treat his pain.  (R. 1475.)

On June 2, 2014, Plaintiff underwent a CT scan for the cervical region related to
his pain.  (R. 987.)  There was some suspicion of early screw loosening with no hardware
movement.  (R. 987.)  Otherwise the CT scan showed mild degenerative changes with no
evidence of significant spinal canal or neural foraminal stenosis.  (R. 987-88.)  Dr.
Sinicropi noted that screw loosening was expected.  (R. 989.)

On December 19, 2014, Dr. Sinicropi opined that foraminal stenosis was significantly improved on the updated CT scan.  (R. 1531.)  Plaintiff asserted that he was still symptomatic, but that his medications helped.  (R. 1531.)

On August 3, 2015, Dr. Wicklund rejected the use of a spinal cord stimulator for arm pain and headaches given Plaintiff's medication regimen and on the basis that his cervical fusion appeared solid.  (R. 1477.)

On February 19, 2016, the examination of Plaintiff showed that he had no active arthritis, no gross motor weakness, and a normal gait.  (R. 1652.)  The motor examination for the upper and lower extremities was normal, but with a reduced range of the lumbar and cervical range.  (R.1652.)

On March 18, 2016, Plaintiff had a follow-up with Dr. Janiga, during which Plaintiff reported moderate improvements with pain medication management, approximately a 35% improvement, with no sedation or any evident intoxication.  (R. 1702.)  Plaintiff's gait was normal upon examination and there was no reduction in reflexes.  (R. 1704-05.)  Dr. Janiga characterized Plaintiff's functioning as improved.  (R. 1705.)

On March 24, 2016, Plaintiff underwent an examination by Dr. Monsein, during which Plaintiff was not in distress, but had some nonspecific tenderness over the cervical and paralumbar regions, mild restriction in cervical range of motion, and was somewhat restricted as to his lumbar region.  (R. 1662, 1666.)  Dr. Monsein did not believe the decreased range of motion was truly an objective finding in light of guarding behaviors. (R 1674.)  Plaintiff's gait was normal as was his straight leg raising.  (R. 1665.)  Dr.

Monsein believed that the objective findings for Plaintiff's claimed pain were minimal, further noting that his neurological examinations had always been unremarkable.  (R. 1674.)  Dr. Monsein opined that one could argue that the decreased range of motion found in the record was not an objective finding, but was a consistent finding throughout the examinations performed on Plaintiff.  (R. 1674.)  The primary finding was guarding with a decreased cervical range and that any limitation on improvement was due to Plaintiff's subjective complaints.  (R. 1674.)

An October 2016 cervical spine MRI and CT showed normal alignment, solid-appearing fusion, and no more than mild to moderate foraminal narrowing with no evidence of stenosis, cord compression, or signal abnormality, and mild degenerative changes.  (R. 1815-17).

Dr. Sinicropi's restrictions are also contradicted by Plaintiff's daily activities. Plaintiff represented that his typical daily activities on good days involved taking short trips and doing some minor housework.  (R. 445.)  He was able to walk half a mile before needing to stop and rest.  (R. 449.)  Even on his bad days, the ALJ's RFC is more consistent with Plaintiff's daily activities than the extreme restrictions imposed by Dr. Sinicropi.  It was also noted that Plaintiff was able to mow the lawn and use a snowblower, which cuts against the restrictions of balancing, stooping, posturing of the neck, repetitive use of the hands, and rare use of the hands for handling and fingering.

Accordingly, this Court concludes that the ALJ's assessment of Dr. Sinicropi's restrictions, the number of days Plaintiff would require off work , the necessary accommodations, and the respective weight assigned to his opinion is supported by

substantial evidence in the record as whole, including representations in the foregoing objective medical record and Plaintiff's activities. *See Fentress v. Berryhill*, 854 F.3d 1016, 1020 (8th Cir. 2017) (finding that if a treating physician's opinion is inconsistent with other substantial evidence, such as physical examinations or claimant's daily activities, the ALJ may discount or disregard the opinion); *Anderson v. Astrue*, 696 F.3d 790, 794 (8th Cir. 2012) (no error in "minimal weight" assigned to treating neurologist's opinion where "the significant limitations [neurologist] expressed in his evaluation are not reflected in any treatment notes or medical records") (citation omitted); *Hacker v. Barnhart*, 459 F.3d 934, 938 (8th Cir. 2006) (discounting treating physician's opinion because it was inconsistent with claimant's daily activities); SSR 96–2p, 1996 WL 374188, at *3 (July 2, 1996) (an ALJ may discount the opinion of a treating physician if it is inconsistent with the evidence in the record, including but not limited to the medical evidence and a claimant's own reported activities).

Further, while Dr. Sinicropi may have been relying on Plaintiff's subjective complaints of pain with respect to his restriction, Eighth Circuit caselaw makes clear that these self-reported limitations are not owed additional weight simply because a medical provider recorded them where the ALJ does not find the subjective complaints credible.[7] *See*, *e.g.*, *Vance v. Berryhill*, 860 F.3d 1114, 1120 (8th Cir. 2017) ("[A]n ALJ need not give a treating physician's opinions controlling weight when the opinion is based on a

---

[7]     As set forth in Section IV.D., *infra*, the Court finds that the weight given the by the ALJ to Plaintiff's subjective complaints to be supported by substantial evidence in the record as a whole.

claimant's subjective complaints that [the] ALJ does not find credible."); *McCoy v. Astrue*, 648 F.3d 605, 617 (8th Cir. 2011) ("Finally, the ALJ noted that Dr. Puente's evaluation appeared to be based, at least in part, on McCoy's self-reported symptoms and, thus, insofar as those reported symptoms were found to be less than credible, Dr. Puente's report was rendered less credible."); *Hawn v. Berryhill*, 2:16-CV-42, 2018 WL 4462256, at *10 (E.D. Mo. Sept. 18, 2018) ("An ALJ may award less weight to a medical opinion when that opinion appears to be largely based on the plaintiff's subjective complaints.") (citing *Sears v. Berryhill*, No. 6:16-CV-3483-CV-RK, 2017 WL 63443804, at *1 (W.D. Mo. Dec. 12, 2017)).

Plaintiff also argues that the ALJ's reliance on the ME and the State Agency Physicians was improper. (Dkt. 1-1 at 2-3, 5, 6, 8, 9, 11; Dkt. 17 at 3.) "State agency medical and psychological consultants are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act." SSR 96-6p, 1996 WL 374180, at *2 (S.S.A. July 2, 1996). In fact, an ALJ "must consider and evaluate" a state agency medical consultant's residual functional capacity assessment. *Id.* at *4. Moreover, in appropriate circumstances, opinions from consultants "may be entitled to greater weight than the opinions of treating or examining sources." *Id.* at *3. The Eighth Circuit has affirmed ALJ decisions that properly discounted treating physicians' opinions and gave significant weight to consultant assessments. *See, e.g.*, *Smith v. Colvin*, 756 F.3d 621, 626-27 (8th Cir. 2014); *Michel v. Colvin*, 640 F. App'x 585, 593 (8th Cir. 2016) (identifying exceptions to the general rule that an ALJ should credit a treating physician's opinion over other medical opinions).

It is important to emphasize that the ALJ did not entirely reject Dr. Sinicropi's opinion despite the fact that it was conclusory questionnaire. *See Thomas v. Berryhill*, 881 F.3d 672, 675 (8th Cir. 2018) (quoting *Toland v. Colvin*, 761 F.3d 931, 937 (8th Cir. 2014)) (finding that questionnaires that "consist of nothing more than vague, conclusory statements—checked boxes, circled answers, and brief fill-in-the-blank responses"—that do not recount medical evidence or provide elaboration "possess 'little evidentiary value.'")).  While the ALJ gave little weight to Dr. Sinicropi's limitations and greater weight to the RFC propounded by the ME and the state agency physicians, which were more akin to a light RFC,[8] the ALJ, based on the available medical record, including symptoms consistent with the record, assigned Plaintiff a lesser sedentary RFC, with limiting occasional reaching above the shoulders, pushing, and pulling.  (R. 26 ("The residual functional capacity accounts for limits in lifting, weight bearing, overhead reaching, and postural activities.  The hazard precautions also accommodate for effects of

---

[8]      Pursuant to the Social Security regulations, light work is defined as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

medication although Dr. Janiga found no inconsistencies or evidence of medication intoxication.").)  Based on a careful review of the record, the Court concludes that the ALJ gave appropriate weight to the opinion of Plaintiff's treating physician based on the record as a whole, and that the RFC formulated by the ALJ is supported by "some medical evidence."  *See Cox v. Astrue,* 495 F.3d 614, 619 (8th Cir. 2007) ("Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace.").

To the extent Plaintiff has cited some evidence in support of his contention that the RFC was incorrect, "substantial evidence to the contrary allowed the ALJ to make an informed decision." *Byes v. Astrue*, 687 F.3d 913, 917 (8th Cir. 2012).  The Court will not reverse the Commissioner even if, sitting as a finder of fact, it would have reached a contrary result, as "[a]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

**D.     The ALJ's Assessment of Plaintiff's Subjective Complaints**

As set forth above, the Commissioner must determine a Plaintiff's RFC based on all of the relevant evidence, including his own description of his limitations.  *See Myers,* 721 F.3d at 527 (citation omitted).  An ALJ should consider several factors, in addition to the objective medical evidence, in assessing a claimant's subjective symptoms, including daily activities; work history; intensity, duration, and frequency of symptoms; any side effects and efficacy of medications; triggering and aggravating factors; and functional restrictions.  *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984); Social Security

Ruling ("SSR") 16-3p, 2016 WL 1119029, at *5-7 (S.S.A. Mar. 16, 2016)[9] (listing these factors as relevant in evaluating the intensity, persistence, and limiting effects of a person's symptoms).  But the ALJ need not explicitly discuss each factor.  *See Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005).

Plaintiff criticizes the ALJ's consideration of his subjective complaints regarding pain and headaches.  (Dkt. 1-1 at 3, 7; Dkt. 17 at 4.)

While there is no dispute that the medical record supports Plaintiff's claim that he suffered from pain and headaches during the relevant period, the medical record supports the ALJ's findings that Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the objective medical evidence and other evidence in the record for the reasons explained in his decision.  As set forth above in Section IV.C. of this Order, *supra*, Plaintiff's objective medical findings during the period he was insured are inconsistent with his claims of debilitating subjective complaints.  *See Crawford v. Colvin*, 809 F.3d 404, 410 (8th Cir. 2015) ("[T]he symptoms [the claimant] attested to are inconsistent with the objective medical evidence found on the record, and hence, need not be given great weight when considered

---

[9]     SSR 16-3p became effective on March 28, 2016 and supersedes SSR 96-7p.  SSR 16-3p eliminates the use of the term "credibility" from the Social Security Administration's sub-regulatory policy, as the regulations do not use this term.  In doing so, the Social Security Administration clarifies that subjective symptom evaluation is not an examination of an individual's character.  Instead, the Social Security Administration will more closely follow the regulatory language regarding symptom evaluation." *Barbara M. v. Saul*, No. 18-CV-1749 (TNL), 2019 WL 4740093, at *7 n. 9 (D. Minn. Sept. 27, 2019) (cleaned up) (quoting *Krick v. Berryhill*, No. 16-cv-3782 (KMM), 2018 WL 1392400, at *7 n.14 (D. Minn. Mar. 19, 2018)).

against objective medical evidence.") (citation omitted).  Moreover, his complaints of pain and headaches are contradicted by his claimed daily activities.  Daily activities that the Eighth Circuit has found contradict disabling pain include: cooking, shopping driving, and visiting relatives, *see Medhaug v. Astrue*, 578 F.3d 805, 816 (8th Cir. 2009); *Chamberlain v. Shalala*, 47 F.3d 1489, 1494 (8th Cir. 1995)), as well as limited grocery shopping, driving short distances, light household chores, attending doctor's appointments, and cooking meals in a microwave, *see Johnson v. Chater*, 87 F.3d 1015, 1018 (8th Cir. 1996).  Here, not only did Plaintiff engage in such activities, he also professed to mowing the lawn, albeit with breaks, and using a snowblower when necessary.  (R. 446-47.)  He was also able to visit his family and friends on a regular basis.  (R. 446-47.)  These activities are inconsistent with the entirely debilitating pain and headaches claimed by Plaintiff and relied upon by Dr. Sinicropi with respect to his restrictions.

In addition, Plaintiff claimed that the ALJ held his workers' compensation award against him as part of the decision.  (Dkt. 1-1 at 11.)  Indeed, the ALJ concluded that "[t]he claimant has not worked since October 2011, but settled a worker's compensation claim in December 2013.  In the absence of medical and overall support for disabling limits, steady work history alone does not bolster his disabling allegations.  While the receipt of worker's compensation is not a presumptive contraindication of disability, it acts as an economic disincentive to seek employment within his residual functional capacity."  (R. 26.)  The ALJ committed no error with respect to this finding.  Although it is not dispositive, an ALJ can look to a claimant's motivation with respect to claims of

subjective complaints.  *See Ostronski v. Chater*, 94 F.3d 413, 419 (8th Cir. 1996) (concluding that the plaintiff's lack of motivation to work was a reasonable basis to discredit the subjective complaints).

The Court acknowledges that the record supports that Plaintiff has undergone consistent treatment for pain during the relevant period, limitations, and accordingly the ALJ limited him to a reduced range of sedentary work, including limitations as to lifting, and limiting occasional reaching above the shoulders, pushing and pulling.  (R. 18, 26.) However, the ALJ's decision that the record as a whole was inconsistent with Plaintiff's claims that he was unable to perform any work due to his pain and headaches is supported by substantial evidence in the record as whole.

In sum, based on the evidence in the record as a whole, including Plaintiff's subjective complaints, the Court finds that the ALJ's RFC is supported by substantial evidence.  *See Nash*, 907 F.3d at 1090 ("This court will not substitute its opinion for the ALJ's, who is in a better position to gauge credibility and resolve conflicts in evidence.") (citation omitted).

**E.     Whether the ALJ Properly Considered Plaintiff's Age**

Plaintiff complains that the ALJ discriminated against him based on his age.  (*See*, *e.g.*, Dkt. 1-1 at 11; Dkt 17 at 3, 4.)  However, the Social Security Regulations require the Commissioner consider a claimant's age:

> (a) General. "Age" means your chronological age. When we decide whether you are disabled under § 404.1520(g)(1), we will consider your chronological age in combination with your residual functional capacity, education, and work experience. We will not consider your ability to adjust to other work on the basis of your age alone. In determining the extent to

which age affects a person's ability to adjust to other work, we consider advancing age to be an increasingly limiting factor in the person's ability to make such an adjustment, as we explain in paragraphs (c) through (e) of this section. If you are unemployed but you still have the ability to adjust to other work, we will find that you are not disabled. In paragraphs (b) through (e) of this section and in appendix 2 to this subpart, we explain in more detail how we consider your age as a vocational factor.

(b) How we apply the age categories. When we make a finding about your ability to do other work under § 404.1520(f)(1), we will use the age categories in paragraphs (c) through (e) of this section. We will use each of the age categories that applies to you during the period for which we must determine if you are disabled. We will not apply the age categories mechanically in a borderline situation. If you are within a few days to a few months of reaching an older age category, and using the older age category would result in a determination or decision that you are disabled, we will consider whether to use the older age category after evaluating the overall impact of all the factors of your case.

(c) **Younger person. If you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work. However, in some circumstances, we consider that persons age 45-49 are more limited in their ability to adjust to other work than persons who have not attained age 45.**

20 C.F.R. § 404.1563 (emphasis added). At the time of the ALJ's decision, Plaintiff was 44 years old, which, as correctly set forth by the ALJ, made Plaintiff a defined "younger person" of age 18-44, on the date last insured, and the ALJ committed no error in this regard.

**F.      VE Hypothetical and Testimony**

Plaintiff argues that the ALJ's hypothetical propounded to the VE was improper because the RFC determined by the ALJ did not take into account all his limitations or necessary accommodations. (Dkt. 1-1 at 11-12; Dkt. 17 at 3, 4.) The ALJ's RFC finding was supported by substantial evidence in the record as a whole. The ALJ's hypothetical

mirrored the limitations that were accounted for in the RFC.  A hypothetical question need only include the impairments and limitations that the ALJ finds are credible and substantially supported by the record as a whole.  *See Scott v. Berryhill*, 855 F.3d 853, 857 (8th Cir. 2017) (a properly phrased hypothetical includes limitations mirroring those of claimant); *see also Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006) ("The ALJ's hypothetical question to the vocational expert needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole."); *Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005).  Thus, the ALJ's hypothetical to the VE was proper given that it was based on an RFC supported by substantial evidence.

Plaintiff also argues that the "DOT book is OUTDATED and the jobs were never proven to actually exist by the VE nor the ALJ" and that he did not have the proper training for these jobs.  (Dkt 17 at 3, 4.)  Indeed, the DOT was last updated in 1991.  *See Kennedy v. Colvin*, No. 2:13-CV-02253, 2014 WL 7335539, at *4 (W.D. Ark. Dec. 22, 2014).  Nevertheless, the Eighth Circuit has concluded that Social Security Ruling 00–4p dictates that "'[i]n making disability determinations, we rely primarily on the DOT (including its companion publication, the SCO) for information about the requirements of work in the national economy.'"  *See Moore v. Colvin*, 769 F.3d 987, 989 n.2 (8th Cir. 2014) (quoting SSR 00–4p); *see also* 20 C.F.R. § 404.1566(d).  Therefore, the Court finds no error in the ALJ's reliance on the DOT.

In terms of training, the Court notes that both the positions of semiconductor bonder, DOT 726.685-066, and optical assembler, DOT 713.687-018, provided by the

VE based on the hypothetical from the ALJ are unskilled.  (R. 59.)  As such, Plaintiff's argument regarding a lack of training is without merit because unskilled work is defined in the Regulations as "'need[ing] little or no judgment to do simple duties that can be learned on the job in a short period of time.'"  *Hulsey v. Astrue*, 622 F.3d 917, 922-23 (8th Cir. 2010) (quoting 20 C.F.R. § 416.968(a)); *see also* 20 C.F.R. § 404.1568(a)).  "Unskilled work is the 'least complex type of work. . . .'"  *Id.* at 923 (quoting SSR 82–41, 1982 WL 31389 (1982) (defining unskilled work as jobs that can usually be learned in 30 days or less)) (cleaned up).

## V.   ORDER

Based on the files, records, and proceedings herein, **IT IS ORDERED THAT:**

1.      Plaintiff Neil M.'s Motion for Summary Judgment (Dkt. 17) is **DENIED**;

2.      Defendant Commissioner of Social Security Andrew Saul's Cross-Motion for Summary Judgment (Dkt. 21) is **GRANTED**; and

3.      This case is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


DATED: September 29, 2020                    *s/Elizabeth Cowan Wright*
                                             ELIZABETH COWAN WRIGHT
                                             United States Magistrate Judge